**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 3, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

DENVER HOMELESS OUT LOUD;
CHARLES DAVIS; MICHAEL LAMB;
SHARRON MEITZEN; RICK MEITZEN,
JR.; TOMASA DOGTRAIL; STEVE
OLSEN; GREGORY COSTIGAN; SEAN
MARTINEZ; LISA MASARO;
NATHANIEL WARNER, on behalf of
themselves and all others similarly situated,

     Plaintiffs - Appellees,

v.

DENVER, COLORADO; MIKE CODY,
Lieutenant, in his individual capacity;
MICHAEL HANCOCK, Mayor, in his
individual capacity; BOB MCDONALD, in
his individual capacity; MURPHY
ROBINSON, in his individual and official
capacity; KRISTIN M. BRONSON, in her
individual and official capacity;
ENVIRONMENTAL HAZMAT
SERVICES; JAMES D. HARVEY,
Officer, in his individual capacity;
DARREN ULRICH, Officer, in his
individual capacity; MALLORY LUTKIN,
Officer, in her individual capacity; BRIAN
CONOVER, Sergeant; MARK MOORE,
Corporal; THANARAT
PHUVHAPAISALKIJ, Officer; ROP
MONTHATHONG, Officer;
CHRISTOPHER RANDALL, Officer;
DAVID HUNTER, Officer; TOBY
WILSON, Officer; JON UDLAND,

No. 21-1025

Officer; ANDREW GASPAROVIC,
Corporal; J.P. BURT, Trooper; JOSEPH
DIRNBERGER, Trooper; DARCE WEIL,
Trooper; WILLIAM CALDWELL,
Trooper; KEVIN RAE, Trooper; COLIN
DAUGHERTY, Trooper; VICTOR
SARGENT, Trooper; DAVID DINKEL,
Trooper; DOUG KLINE, Trooper;
GREGORY DAVEY, Trooper; JEREMY
HARRINGTON, Trooper;
CHRISTOPHER GONZALES, Trooper;
RUSTY SANCHEZ, Trooper; PATRICK
WILLIAMS, Trooper; JACOB
CLEVELAND, Trooper; CRYSTAL
CRENSHAW, Trooper; RYAN A. VOSS,
Trooper; UMAIR CHEEMA, Trooper;
NATHAN HARDY, Trooper; GEOFFREY
KEELING, Trooper; HAAS E. PRATT,
Trooper; NICHOLAS TRUJILLO,
Trooper; TY SIMCOX, Trooper; SEAN
MCCALL, Trooper; HEIDI JEWETT,
Trooper; KYLE ROSS, Trooper; ALEC W.
BARKLEY, Trooper; BRYAN
LARREAU, Trooper; THOMAS MAJOR,
Trooper; JONATHAN STRICKLAND,
Trooper; A. MARTINEZ, Sergeant; in
her/his individual capacity; ANTHONY
MARTINEZ, Sergeant; BRANDON
NOVY, Trooper; DAVID MARTINEZ,
Officer,

       Defendants - Appellants,


and


JARED POLIS, Governor, in his official
capacity,

       Defendant.

2

------------------------------

NATIONAL HOMELESSNESS LAW
CENTER; AMERICAN CIVIL
LIBERTIES UNION OF COLORADO,

      Amici Curiae.

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:20-CV-02985-WJM-SKC)**
_____

Conor D. Farley, Denver City Attorney's Office (Geoffrey C. Klingsporn and Wendy J.
Shea with him on the briefs), Denver, Colorado, for Defendants – Appellants.

Andrew McNulty, Killmer, Lane & Newman, LLP (David A. Lane, Darold W. Killmer,
and Reid R. Allison with him on the brief), Denver, Colorado, for Plaintiffs – Appellees.

Anna Kurtz and Mark Silverstein, ACLU Foundation of Colorado, Denver, Colorado,
filed an amicus brief on behalf of the American Civil Liberties Union of Colorado.

Tristia M. Bauman, Carlton Martin, and Joseph W. Mead, National Homelessness Law
Center, Washington, D.C., filed an amicus brief on behalf of the National Homelessness
Law Center.
_____

Before **McHUGH**, **MURPHY**, and **ROSSMAN**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

3

The Denver Defendants have authorized and/or conducted sweeps of homeless encampments throughout Denver, Colorado.[1] The advocacy organization Denver Homeless Out Loud and several people experiencing homelessness ("DHOL Plaintiffs") allege these sweeps violated the rights of persons experiencing homelessness and breached a settlement agreement resolving related litigation. The DHOL Plaintiffs therefore filed this putative class action and corresponding motion for a preliminary injunction. They asked the United States District Court for the District of Colorado to enjoin all sweeps or, in the alternative, require seven days' advanced notice for all sweeps. The district court granted the motion in part after concluding the DHOL Plaintiffs' procedural due process claim was likely to succeed on the merits. The district court then issued a preliminary injunction requiring the Denver Defendants to satisfy additional notice and procedural requirements before conducting future sweeps.[2] The Denver Defendants timely filed this interlocutory appeal challenging the injunction.

Exercising our jurisdiction under 28 U.S.C. § 1292(a)(1), we vacate the district court's order and remand for further proceedings consistent with this opinion.

---

[1] The Denver Defendants include the City and County of Denver, Mayor Michael Hancock, Executive Director of Denver's Department of Public Health and Environment Bob McDonald, Executive Director of Denver's Department of Safety Murphy Robinson, City Attorney for Denver Kristin Bronson, numerous Denver Police Department law enforcement officers, and hundreds of John and Jane Does.

[2] The DHOL Plaintiffs also named Colorado Governor Jared Polis as a Defendant. The district court denied the preliminary injunction motion in full as to the Governor, and this ruling is not disputed on appeal.

## I.    BACKGROUND

### A.    *The* Lyall *Litigation and Settlement*

Encampments of people experiencing homelessness have proliferated throughout Denver. In response, Denver banned unauthorized camping on public or private property. *See* Denver, Colo., Code § 38-86.2. The Denver Defendants enforce the camping ban in the following ways. The Denver Department of Public Health and Environment ("DDPHE") can issue an "area restriction," which "temporarily restricts activities that could occur in a specified area" to allow officials to remediate public health hazards. App. Vol. X at 2270. The Department of Transportation and Infrastructure ("DOTI") assists DDPHE in "cleaning locations that are subject to . . . area restrictions." App. Vol. IV at 807. DOTI can also independently conduct large-scale "encumbrance removals," where it clears and cleans an area "to make sure that the public right-of-way is accessible to all Denver residents." App. Vol. X at 2110. These activities are colloquially known as homeless sweeps.[3]

In 2016, people affected by these sweeps filed a class action against Denver and certain city officials in the United States District Court for the District of Colorado. *See Lyall v. City of Denver*, 319 F.R.D. 558, 562 n.2 (D. Colo. 2017). The *Lyall* plaintiffs

---

[3] The Denver Defendants object to the term "sweeps," believing it has a "negative connotation" and "elides the distinction between area restrictions ordered by DDPHE with large-scale encumbrance cleanups conducted by DOTI." Aplt. Br. at 8 n.6. However, this is the term used by the district court and by most witnesses in the record. We are mindful of the distinction between area restrictions and large-scale encumbrance removals and treat them as distinct activities when appropriate.

alleged, *inter alia*, that Denver's "policies, practices and conduct violate [p]laintiffs' right to due process of law under the Fourteenth Amendment." *Lyall* Amended Complaint at 33, *Lyall*, 319 F.R.D. 558 (No. 1:16-cv-2155), ECF No. 54. The *Lyall* Amended Complaint specifically claimed the sweeps "are conducted without notice or with inadequate notice and in a manner that prevents [p]laintiffs and [p]laintiff [c]lass from retrieving their property." *Id.* at 7.

The *Lyall* Amended Complaint then described sweeps from October 2015, December 2015, March 2016, July 2016, and August 2016, in which Denver allegedly violated the *Lyall* plaintiffs' procedural due process rights. For example, in October 2015, Denver Police and Public Works staff swept an encampment located in a park. The *Lyall* plaintiffs alleged the defendants "seized and destroyed personal property belonging to [the plaintiffs] without providing notice or the required procedural safeguards as to how this property could be retrieved." *Id.* at 20. Property, including "military records, identification, blankets, clothing and a wheelchair," was "taken and indiscriminately thrown into Denver Public Works' dump trucks." *Id.* Importantly, the *Lyall* Amended Complaint stressed Denver's sweeps amounted to a coherent and multi-year "policy and custom of raiding areas where homeless people are trying to survive and intentionally taking and destroying their property." *Id.* at 6; *see also id.* at 19 ("Defendant's taking and destruction of property was foreseeable as [d]efendants had performed it on numerous prior occasions. The sweeps had become a custom of the City of Denver.").

6

The parties in *Lyall* settled in February 2019, shortly before trial. The district court then entered a Final Judgment stating, "this civil action and Complaint are dismissed as settled and the case will be closed." *Lyall* Final Judgment at 1, *Lyall*, 319 F.R.D. 558 (No. 1:16-cv-2155), ECF No. 226. The *Lyall* settlement agreement sets forth detailed protocols for Denver's future enforcement of the camping ban and releases a broad range of city parties from present and future liabilities. The agreement's relevant provisions are discussed *infra*.

## B.    *Post*-**Lyall** *Sweeps*

Sweeps have continued post-*Lyall* and during the pandemic. The DHOL Plaintiffs' Amended Complaint and preliminary injunction motion focus on three specific sweeps— July 2020 in Lincoln Park, August 2020 around Morey Middle School, and September 2020 near the South Platte River. A description of the July 29 Lincoln Park sweep, which is representative of the Denver Defendants' actions during the other two sweeps, follows.[4]

Lincoln Park is located in downtown Denver on state property. The park was in "really bad condition" in the summer of 2020 largely due to the "very large encampment"

---

[4] The DHOL Plaintiffs also focus on an August 2020 sweep around Morey Middle School and a September 2020 sweep of a large encampment of RVs and tents near the South Platte River. The description of the actions taken by the Denver Defendants during these two sweeps is similar to the description of actions taken during the Lincoln Park sweep. Moreover, in arguing for class certification, the Amended Complaint notes the sweeps share common issues of fact and law. Accordingly, we describe the Lincoln Park sweep in some detail as an example of the challenged activity.

it hosted. App. Vol. X at 2120. The park was littered with large amounts of trash, food waste, and improperly discarded syringes. And it suffered from a significant rat infestation. DOTI had not cleaned the park "because of concerns for safety for [] staff." *Id.* at 2121. Denver Park Rangers had witnessed the "wide-spread and open use and trade of drugs in the park." App. Vol. IV at 718. And Colorado State Patrol was not able to maintain security in the park due to "[t]he volume of people [who] were in and out of the park and the harassment and threats of violence that were taking place in the park." App. Vol. XI at 2506. All the security cameras in the park had been destroyed. Gunshots were heard at least eight to ten times in the weeks leading up to July 29, and there was a murder in the park on July 23.

On July 29, 2020, the Denver Defendants conducted a sweep of the encampment in Lincoln Park. DOTI swept the park after DDPHE restricted the area for public health reasons. The sweep was not a large-scale encumbrance removal.

The record does not show exactly when the Denver Defendants began planning the sweep, but it demonstrates they did plan it in advance. Around July 26, Denver Police notified the Colorado State Patrol that they would be clearing Lincoln Park sometime soon. On July 27, a Colorado State Patrol operations plan states a local nonprofit began telling campers in Lincoln Park about a forthcoming sweep. On July 28, the Denver Defendants notified the Colorado State Patrol that they had selected the following day as the sweep date. Also on July 28, Park Rangers told campers in Lincoln Park that due to "recent gun violence and the detection of COVID within the park, concern has been

8

raised over [their] safety and health here in [Lincoln] Park. This is state property, but Denver Park Rangers are hearing that the park may be closed soon." App. Vol. IV at 818. The Rangers did not tell campers the park was closing the following day.

Despite the advanced planning, DDPHE did not post notice of the area restriction on Lincoln Park until the morning of July 29. That notice stated Lincoln Park "presents public and environmental health risks due to unsafe conditions associated with pest activity, harborage conditions, human waste, and trash accumulation. The Area shall remain temporarily **ACCESS CLOSED** for purposes of cleaning and abatement[.]" App. Vol. IV at 829. The notice did not identify any emergency. In an evidentiary hearing, Danica Lee, DDPHE's director of Public Health Investigation, testified that advance notice was not given because DDPHE "felt that it was safer to [] provide the notice the day of," given the prior aggressive interactions with campers in Lincoln Park and with protestors at prior sweeps.[5] App. Vol. X at 2204.

---

[5] In June 2020, DDPHE had provided seven days' advance notice for a sweep of an encampment on 21st and Stout Street in Denver. When the Denver Defendants arrived on June 17 to post the area restriction, enforce the area restriction, and clean the area, protestors disrupted the sweep. Director Lee testified that the protestors "made every effort to interfere with the work of the city employees [who] were out there as well as the people who were encamped and trying to pack up belongings." App. Vol. X at 2202. She described the scene as "a lot of very aggressive people shouting, yelling. Trying to push through, you know, areas that the police were trying to secure as safe spaces. It was a -- it was a very challenging situation from a safety standpoint and I think very scary for, you know, folks who were involved there." *Id.* The Denver Defendants did not complete the sweep due to the protestors.

9

During the sweep, the Denver Defendants seized and destroyed property belonging to DHOL Plaintiffs. Plaintiff Michael Lamb was camping in Lincoln Park at the time. He testified that he awoke to trash trucks surrounding the park on July 29. He was told to move his belongings outside the park, but he could move only some of his items. When he attempted to retrieve the rest of his property, a large fence erected around the park prevented him from re-entering. From outside the fence, he saw the Denver Defendants throw away his and others' property that he claimed was uncontaminated and unabandoned. *See* App. Vol. V at 981 (stating his tent and other property in the park "was clearly not trash and was not contaminated with any blood, hypodermic needles, or rodents"). Mr. Lamb "was not provided with a ticket, or other notice, that [the Denver Defendants] had seized and stored [his] property, where they had stored [it], and/or how [he] could retrieve any property." *Id.* at 981. Another Plaintiff, Charles Davis, had a similar experience. He crossed the fence only to find his tent "had been taken and destroyed by [the Denver Defendants], along with everything in it." *Id.* at 986. Mr. Davis slept tentless on a nearby median for multiple nights after the sweep.

The Denver Defendants claim "people who were present (or returned to [Lincoln Park]) were given over four hours to pack up their belongings (or choose voluntary, free storage) and leave." App. Vol. IV at 765. DOTI also stated that it "stored items for 3 individuals who collectively stored about 3 bins and several loose items and also stored approximately 3 bins of unattended possessions." *Id.* at 810. But Terese Howard, founder of Plaintiff Denver Homeless Out Loud, attended numerous sweeps and testified that she

had never seen efforts to store property or identify property with apparent value. The DHOL Plaintiffs also state that the Denver Defendants' general website describing how to recover stored property seized during sweeps contradicts their claim that they stored any property in the Lincoln Park sweep.

### C.   *District Court Proceedings*

In October 2020, the DHOL Plaintiffs filed this putative class action and requested the district court preliminarily enjoin the Denver Defendants and Colorado Governor Jared Polis. The operative Amended Complaint frames this as an action to enforce the *Lyall* settlement agreement—its first sentence states this case is about a "blatant effort to skirt a settlement agreement entered into between Denver and a class of its homeless population." App. Vol. III at 488. Accordingly, the DHOL Plaintiffs seek relief under Colorado law for Defendants Denver and Mayor Michael Hancock's alleged breach of the agreement. In addition, they seek relief pursuant to 42 U.S.C. § 1983 for the Denver Defendants' alleged violation of their procedural due process rights.[6]

---

[6] The Amended Complaint includes many additional constitutional, statutory, and common law claims. The preliminary injunction motion does not encompass all of the claims alleged in the Amended Complaint, and this appeal does not involve all of the issues included in the preliminary injunction motion. Of note, the Amended Complaint carves out Plaintiff Lisa Masaro from the procedural due process claim. She removed her property from an encampment before the Denver Defendants swept it, meaning her claims arise from being "forced to flee the encampment" and the "greater risk of COVID-19" she now bears. App. Vol. III at 551. The district court ruled these kinds of claims cannot sustain a preliminary injunction, and the DHOL Plaintiffs do not dispute this ruling. Ms. Masaro's claims are therefore not at issue on appeal.

In their accompanying Motion for Preliminary Injunction and Expedited Hearing, the DHOL Plaintiffs argue the Denver Defendants violated their procedural due process rights in three ways: "(1) Defendants provided no (or deficient) notice prior to seizing their property, (2) Defendants summarily discarded (and destroyed) Plaintiffs' property without any process for challenging the destruction, and (3) post-deprivation, Defendants did not provide an adequate process for Plaintiffs to challenge the seizure of their property or retrieve their property." *Id.* at 632. Of note, the Amended Complaint connects its procedural due process claim to the *Lyall* settlement agreement. *Id.* at 578 (stating the DHOL Plaintiffs had "an interest in being afforded notice prior to the seizure of their property [during sweeps], pursuant to the Settlement Agreement").

On November 25, 2020, the Denver Defendants filed a motion to dismiss based on the preclusive effect of the *Lyall* settlement agreement. Due to procedural defects, the district court struck that motion. For reasons not apparent from the record, the Denver Defendants did not immediately refile it or otherwise raise preclusion.

Following limited expedited discovery, the district court conducted a three-day evidentiary hearing on the preliminary injunction motion. The district court heard from eighteen witnesses during the hearing. It also considered multiple exhibits and various declarations. The Denver Defendants did not raise the preclusive effect of the *Lyall* settlement agreement in opposition to the preliminary injunction.

As a result, the district court did not address preclusion in its order granting a preliminary injunction. Nor did it consider the *Lyall* settlement agreement's potentially

12

preclusive provisions. Its entire discussion of the *Lyall* settlement agreement was confined to its breach of contract analysis—where the district court correctly concluded it lacked jurisdiction to enforce the agreement. This conclusion is not challenged on appeal.

Instead, the district court analyzed whether the procedural due process claim was likely to succeed on the merits, but it did so without considering if the *Lyall* settlement agreement barred the claim. The district court then granted a preliminary injunction based solely on its finding that the procedural due process claim was likely to succeed. The preliminary injunction requires the Denver Defendants to satisfy notice requirements beyond those included in the *Lyall* settlement agreement.

Approximately two months later, on March 4, 2021, the Denver Defendants filed a Motion to Dismiss, arguing, *inter alia*, the *Lyall* settlement agreement precluded the due process claim under the doctrines of collateral estoppel and res judicata. The DHOL Plaintiffs argued against preclusion in their response brief, and the Denver Defendants addressed the issue again in their reply brief. That motion remains pending before the district court.

On January 26, 2021, the Denver Defendants filed this interlocutory appeal claiming the preliminary injunction was improperly granted.[7]

---

[7] Two entities filed *Motions for Leave to File an Amicus Brief*, seeking leave before this court to participate as amici curiae in support of the DHOL Plaintiffs: (1) the National Homelessness Law Center; and (2) the American Civil Liberties Union of Colorado. The Denver Defendants oppose each motion. The court provisionally granted both motions for leave to participate as amici in support of the DHOL Plaintiffs, subject

## II.  DISCUSSION

We begin our analysis with a discussion of the impact of the *Lyall* settlement on both jurisdiction and the merits. Although the district court correctly noted it lacked jurisdiction to enforce the *Lyall* settlement agreement, we conclude it improperly failed to consider sua sponte the preclusive effect of that agreement. In reaching this conclusion, we explain why we raise the preclusive effect of the *Lyall* settlement agreement sua sponte, despite the Denver Defendants' failure to raise it as a defense to the preliminary injunction motion or to reassert preclusion on appeal. We then conclude that the preclusive effect of the agreement makes it unlikely the DHOL Plaintiffs will succeed on the merits of their procedural due process claim. Specifically, the *Lyall* settlement agreement includes a broad release that unequivocally prevents the DHOL Plaintiffs from asserting this specific procedural due process claim against the Denver Defendants.

The district court's omission of a preclusion analysis is understandable in light of the Denver Defendant's failure to reassert preclusion after the district court struck their motion to dismiss. Because the Supreme Court urges sua sponte consideration of preclusion in situations like the present, however, we conclude the district court's finding that a precluded procedural due process claim was likely to succeed on the merits is an error of law, and the failure to consider the release provision of the *Lyall* settlement agreement means the district court's decision lacks a rational evidentiary basis.

---

to reconsideration by this panel. We hereby grant each entity permission to file a brief as amici curiae in support of the DHOL Plaintiffs.

Accordingly, we vacate and remand the district court's order granting the preliminary injunction.[8]

## A.  *Procedural Issues*

Before evaluating the merits of the Denver Defendants' preclusion defense, we first address two threshold procedural issues—jurisdiction and preservation. For the reasons discussed below, we have jurisdiction to consider the preclusion defense and we choose to do so, despite the Denver Defendants' failure to properly preserve this defense for appeal.

## 1.  Jurisdiction

We agree with the district court that we lack jurisdiction to enforce the terms of the *Lyall* settlement agreement. Although a federal district court dismissed the *Lyall* case, its Final Judgment stated only "this civil action and Complaint are dismissed as settled and the case will be closed." *Lyall* Final Judgement at 1, *Lyall*, 319 F.R.D. 558 (No. 1:16-cv-2155), ECF No. 226. The *Lyall* Final Judgment neither incorporated the agreement's terms nor expressly retained jurisdiction over the agreement. As a result, enforcement of the *Lyall* settlement agreement is a matter for a state court. *See Kokkonen v. Guardian*

---

[8] Before this court, the DHOL Plaintiffs filed a *Motion to Supplement Appendix with Materials Not Previously Entered in District Court Record*, seeking leave to file additional materials to respond to the Denver Defendants' argument that the Preliminary Injunction Order is impermissibly ambiguous. The Denver Defendants oppose the motion. Because we do not reach the Denver Defendants' ambiguity argument, we deny the DHOL Plaintiff's motion to supplement the appendix.

*Life Ins. Co. of Am.*, 511 U.S. 375, 382 (1994) (stating "enforcement of [a] settlement agreement is for state courts" absent incorporation or express retention of jurisdiction).

However, an absence of jurisdiction to enforce the *Lyall* settlement agreement does not prevent this court from determining its preclusive effect. Although the DHOL Plaintiffs framed this case as an action to enforce the *Lyall* settlement agreement, it is a new action separate from *Lyall*. The DHOL Plaintiffs brought the relevant procedural due process claim under 42 U.S.C. § 1983. We need not retain jurisdiction over *Lyall* or its attendant settlement agreement to exercise subject matter jurisdiction over the federal question raised in this new suit. *See Rural Water Dist. No. 2 v. City of Glenpool*, 698 F.3d 1270, 1273–74 (10th Cir. 2012) (holding that a lack of jurisdiction to enforce a settlement "does not relate to our subject matter jurisdiction" over "a violation of a [federal] statutory right" like those protected by § 1983). And the success of that claim depends, in part, on the preclusive effect of the district court's dismissal of the *Lyall* action, which is a proper question for this court. *See Yapp v. Excel Corp*., 186 F.3d 1222, 1226 (10th Cir. 1999) ("Federal law determines the effects under the rules of *res judicata* of a judgment of a federal court.") (quotation marks omitted). Moreover, this court is empowered to deal with all aspects of the case in an appeal from the grant of a preliminary injunction, including the resolution of issues otherwise not appealable. *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1352 (10th Cir. 1989).

## 2. Preservation

The Denver Defendants' appellate briefs provide multiple reasons why the district court abused its discretion, but the preclusion defense is not among them.[9] Indeed, the preclusion issue was not raised before the district court until after the parties had fully litigated the preliminary injunction. We ordinarily decline to consider arguments not raised in an opening brief. *See City of Colo. Springs v. Solis*, 589 F.3d 1121, 1135 n.5 (10th Cir. 2009) ( "[A]rguments not raised in the opening brief are waived."); *see also Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ( "[T]he omission of an issue in an opening brief generally forfeits appellate consideration of that issue."). "Waiver, however, binds only the party, not the court," and "it is well-settled that courts have discretion to raise and decide issues sua sponte, even for the purpose of reversing a lower-court judgment." *Planned Parenthood of Kan. & Mid-Missouri v. Moser*, 747 F.3d 814, 837 (10th Cir. 2014). Several factors compel this court to exercise our discretion here.

First, the Supreme Court has encouraged courts to raise preclusion sua sponte when "special circumstances" exist. *Arizona v. California*, 530 U.S. 392, 412 (2000); *see also Burrell v. Armijo*, 456 F.3d 1159, 1176 (10th Cir. 2006) (McConnell, J., concurring) ("It is well established that a court may raise the issue of preclusion on its own motion, in

_____

[9] Whether the Denver Defendants satisfactorily raised their preclusion defense at oral argument is debatable, but either way, "[i]ssues raised for the first time at oral argument are considered waived." *Estate of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1169 n.7 (10th Cir. 2020) (quotation marks omitted).

appropriate cases."). One such circumstance is when "a court is on notice that it has previously decided the issue presented," as sua sponte consideration furthers the court's own interest in "the avoidance of unnecessary judicial waste." *Arizona*, 530 U.S. at 412 (2000) (quotation marks omitted). Here, we have ample notice that the district court may have previously resolved the instant procedural due process claim. The parties thoroughly debated the preclusive effect of the *Lyall* settlement agreement in the district court, and the DHOL Plaintiffs argued the agreement should still govern the Denver Defendants' behavior.

Second, the Supreme Court has suggested courts should consider "an issue antecedent to and ultimately dispositive of the dispute before it, even an issue the parties fail to identify and brief" on appeal. *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993). The preclusion defense satisfies these criteria. If the *Lyall* settlement agreement forecloses the procedural due process claim, that claim will necessarily fail on the merits and cannot serve as the basis for a preliminary injunction.

Third, appellate review of a waived issue is particularly appropriate when the issue is "a pure matter of law and its proper resolution is certain." *Margheim v. Buljko*, 855 F.3d 1077, 1088 (10th Cir. 2017) (quotation marks omitted). The preclusive effect of the *Lyall* settlement agreement is a question of law that this court reviews de novo. *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008). The parties have fully briefed the issue and have included the agreement in the record. Their briefing describes the post-*Lyall* sweeps in great detail, and the district court conducted a

18

multi-day evidentiary hearing on those sweeps. No further factual development is necessary.[10] And for reasons discussed *infra*, we are confident the *Lyall* settlement agreement likely precludes the DHOL Plaintiffs' procedural due process claim. Indeed, the DHOL Plaintiff's motion for preliminary injunction is based on the argument that "Defendants violated Plaintiffs' procedural and substantive due process rights *under the Lyall settlement agreement.*" App. Vol. III at 634 (emphasis added).

The above reasons motivate this court to raise the Denver Defendants' preclusion defense sua sponte. We turn to the *Lyall* settlement agreement's preclusive effect now.

## B.  *Preclusion*

"[U]nder federal law, settlements have claim-preclusive effect between the parties to the settlement." *Nichols v. Bd. of Cnty. Comm'rs of Cnty. of La Plata, Colo.*, 506 F.3d

---

[10] The dissent suggests further factual development is required to determine the scope of the *Lyall* settlement agreement prior to this court addressing any preclusive effect it may have on the DHOL Plaintiffs' procedural due process claim. Dissent Op. at 17–21. We disagree. The DHOL Plaintiffs did not make such an argument in their response to the Denver Defendants' Motion to Dismiss. *See Zen Magnets, LLC v. Consumer Prod. Safety Comm'n*, 968 F.3d 1156, 1170 (10th Cir. 2020) (noting this court ordinarily declines to consider arguments not presented to the district court). To the contrary, the DHOL Plaintiffs specifically rely on the *Lyall* settlement agreement as the basis for the claims supporting preliminary injunction. App. Vol. VIII at 1535 (framing the First Amended Complaint around Denver Defendants' "blatant effort to skirt a settlement agreement entered into between Denver and a class of its homeless population"). Because the DHOL Plaintiffs have not raised any issues of ambiguity in the *Lyall* settlement agreement as an argument against preclusion, and they further seek injunctive relief based on the Denver Defendants' alleged "skirt[ing]" of that settlement agreement, any factual issues are best considered by a state court tasked with enforcing the *Lyall* settlement agreement. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 382 (1994) (stating "enforcement of [a] settlement agreement is for state courts" absent incorporation or express retention of jurisdiction).

962, 969 (10th Cir. 2007) (citing *Arizona*, 530 U.S. at 414). Federal law applies here,

where a federal district court entered the final judgment adopting a settlement. *See Yapp*,

186 F.3d at 1226. Claim preclusion—also known as res judicata—applies when there is

"(1) a final judgment on the merits in an earlier action; (2) identity of parties or privies in

the two suits; and (3) identity of the cause of action in both suits." *Johnson v. Spencer*,

950 F.3d 680, 693 (10th Cir. 2020) (quotation marks omitted). "Even if these three

elements are satisfied, there is an exception to the application of claim preclusion where

the party resisting it did not have a full and fair opportunity to litigate the claim in the

prior action." *Id*. (quotation marks omitted).

Importantly, settlements "are of a contractual nature and, as such, their terms may

alter the preclusive effects of a judgment." *In re Young*, 91 F.3d 1367, 1376 (10th Cir.

1996) (quotation marks omitted). Stated differently, contractual provisions can supplant

traditional preclusion principles "if it is clear that the parties intended preclusion as a part

of their agreement." *Id.* We hold the *Lyall* settlement agreement intended to, and does,

preclude the specific procedural due process claim the DHOL Plaintiffs assert here.

**1.  Preclusion is Part of the *Lyall* Settlement Agreement**

The plain text of the *Lyall* settlement agreement makes clear the parties intended it

to have preclusive effect.[11] The agreement includes a broad release, which provides:

---

[11] Neither party disputes the *Lyall* settlement agreement is a final judgment on the merits for res judicata purposes. *See Arizona v. California*, 530 U.S. 392, 414 (2000) (stating settlements "ordinarily support claim preclusion"); *see also Hoxworth v. Blinder*,

All persons in the City and County of *Denver whose personal belongings may in the future be taken or destroyed without due process* on account of the City and County of Denver's alleged custom or practice (written or unwritten) of sending ten or more employees or agents to clear away an encampment of multiple homeless persons by immediately seizing and discarding the property found there . . .

. . . hereby release, acquit, and forever *discharge the City and County of Denver, and any [and] all other related persons and entities*, both past and present, including but not limited to all departments, divisions, principals, attorneys, agents, employees, employers, successors, servants, elected officials, officers, and directors (the "Released Parties"), of and from *any and all liabilities, claims*, demands, rights, controversies, agreements, damages, actions, causes of actions, expenses, attorney fees, interest, compensation, judgment and any and all consequential and punitive damages, of whatsoever kind and nature, either in law or in equity, *which might exist or might be in any way related to or giving rise to above-referenced Lawsuit*, including, but not limited to, any and all claims arising out of the City's alleged custom or practice (written or unwritten) of sending ten or more employees or agents to clear away an encampment of multiple homeless persons by immediately seizing and discarding the property found there.

App. Vol. II at 293–94 (emphasis added).

The agreement reiterates the far-reaching scope of its release throughout the document. It states that the plaintiffs in *Lyall* "*shall not, under any circumstances, seek to present further claims* on behalf of themselves" or others against the Released Parties. *Id.* at 295 (emphasis added). Additionally, the plaintiffs in *Lyall*

covenant[ed] and agree[d] that *they will not bring any action* at law, proceeding in equity, administrative proceeding, or otherwise, nor

---

74 F.3d 205, 208 (10th Cir. 1996) ("Generally, court-approved settlements receive the same *res judicata* effect as litigated judgments."). The exceptions are not relevant. *See Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329–30 (1955) (holding a settlement did not preclude a later action involving a different claim not discussed in the settlement).

prosecute or sue by way of complaint, counterclaim, or by any other
manner at all, relating to the facts and claims which were or could have
been asserted in their Claim against the Released Parties or in a subsequent
lawsuit relating to the facts and allegations concerning the events outlined
in the Amended Complaint or any damage to the class members resulting
from the cleanup of homeless encampments by Denver.

*Id.* (emphasis added)

## 2. The Release Encompasses the Parties to this Litigation

### a. The DHOL Plaintiffs

The DHOL Plaintiffs are parties whose property was allegedly taken without due

process after the *Lyall* settlement.[12] The Amended Complaint acknowledges the DHOL

Plaintiffs are members of the plaintiff class in *Lyall*. *See* App. Vol. III at 592 (noting the

DHOL Plaintiffs are "members of a class . . . which settled [p]laintiffs claims against

Defendant Denver in the matter of *Lyall, et al. v. Denver*").

Moreover, because the class bound by the agreement includes "[a]ll persons in the

City and County of Denver whose personal belongings *may in the future* be taken or

destroyed without due process" during a sweep, the agreement reaches any current

DHOL class member. App. Vol. II at 293 (emphasis added). It is well settled that prior

class-action judgments bind "absent class members" that were "adequately represented"

in the first case. *Pelt v. Utah*, 539 F.3d 1271, 1284 (10th Cir. 2008). Inadequate

representation occurs "only where the requirements of due process were not afforded."

---

[12] Of note, 75 of Denver Homeless Out Loud's core membership are either
currently homeless or formerly homeless. App. Vol. III at 491.

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc*., 847 F.3d 1221, 1243 (10th Cir. 2017).

The DHOL class members were adequately represented in *Lyall*.[13] They do not argue their counsel was constitutionally deficient or their due process rights were violated. And as the Denver Defendants note, the DHOL Plaintiffs are "represented by the same counsel who represented the class and negotiated the settlement in *Lyall*, [and] cannot be heard to argue that he was unqualified or that those plaintiffs were not vigorously protected." Reply to Resp. to Mot. to Dismiss at 4, *Denver Homeless Out Loud v. Denver, Colo.*, 514 F. Supp. 3d 1278 (D. Colo. 2021) (No. 1:20-cv-02985), ECF No. 203.

### b. The Denver Defendants

The DHOL Plaintiffs do not contest that the City and County of Denver is a party to both the instant action and *Lyall*. They argue instead that "there is certainly no privity between the individual Defendants here[] and Defendant Denver." Resp. to Mot. to Dismiss at 4, *Denver Homeless Out Loud*, 514 F. Supp. 3d 1278 (D. Colo. 2021) (No. 1:20-cv-02985), ECF No. 196.

Yet, it is not necessary to establish privity here, where the plain language of a settlement agreement inoculates each individual defendant from the relevant claim. *See In*

---

[13] This also renders the "exception to the application of claim preclusion where the party resisting it did not have a full and fair opportunity to litigate the claim in the prior action" inapplicable here. *Johnson v. Spencer*, 950 F.3d 680, 693 (10th Cir. 2020) (quotation marks omitted).

*re Young*, 91 F.3d at 1376 (stating a settlement's language can alter its preclusive effect). In *Mata v. Anderson*, a family entered into a settlement agreement with a city and several of its officers who had allegedly violated their civil rights. 635 F.3d 1250, 1251 (10th Cir. 2011). The agreement released the city and its "employees" from "all claims, suits, . . . actions and causes of action" arising out of the original action. *Id.* at 1253. The agreement also stated that it "shall be construed to extinguish and discharge . . . any and all claims that [p]laintiffs now have or could hereafter assert against any of the Released Parties of any nature whatsoever." *Id.* When a family member sued an officer years later, this court held the agreement's "plain language precludes the . . . claims at issue here, as [the officer] is an employee covered by the release." *Id.* at 1253–54. This court further held the waiver of all claims "against any of the Released Parties of any nature whatsoever" precluded claims brought against the officer in either his official or individual capacity. *Id.* at 1254 n.1. This court did not evaluate whether the officer in the second lawsuit was in privity with those from the first lawsuit or its attendant settlement agreement.

The circumstances here closely resemble those in *Mata.* The *Lyall* settlement releases "the City and County of Denver*, and any [and] all other related persons and entities*," including its "agents, employees, . . . elected officials, [and] officers," from "any and all liabilities, claims, demands, rights, controversies, [] damages, actions, causes of actions, . . . *and any and all consequential and punitive damages, of whatsoever kind and nature . . .* in any way related to" Denver's homeless sweeps. App. Vol. II at 294 (emphasis added). The individual Defendants are all Denver employees or elected

24

officials, meaning they all fall within the parties covered by the release. Each individual

Defendant can thus benefit from the preclusion defense under this court's

well-established precedent. Moreover, the agreement's waiver of all damages "of

whatsoever kind and nature" precludes claims brought against any of the Denver

Defendants in their individual capacity. *Id.*

### 3.  The Release Encompasses the Instant Procedural Due Process Claim

The *Lyall* settlement agreement forever discharges "any and all claims arising out

of the City's alleged custom or practice (written or unwritten) of sending ten or more

employees or agents to clear away an encampment of multiple homeless persons by

immediately seizing and discarding the property found there." App. Vol. II at 294. This

covers the claim at issue on appeal. The Amended Complaint states that the "Defendant

Denver's customs, policies, and/or practices, and the decisions of its final policymakers,

were the moving force behind the Defendants' violation of Plaintiffs' [Fourteenth

Amendment] rights." App. Vol. III at 577. Thus, the claim here arises from Denver's

custom—the very activity discharged by the *Lyall* settlement agreement.

The DHOL Plaintiffs disagree, offering four reasons why this case presents a new

cause of action.[14] In this circuit, a cause of action is identical for res judicata purposes if

_____

[14] Even if the causes of action in *Lyall* and this case are distinct, there are "several
exceptions to the rule that only claims related to the existing transaction are precluded"
under the doctrine of res judicata. *Hatch v. Boulder Town Council*, 471 F.3d 1142, 1150
(10th Cir. 2006). One exception is triggered "where the judgment entered in the prior
action [] incorporated a settlement intended to govern future, related transactions between

25

it arises out of the same event or series of events which concluded in a valid and final judgment. *See Hatch v. Boulder Town Council*, 471 F.3d 1142, 1149 (10th Cir. 2006) ("[A] claim arising out of the same transaction, or series of connected transactions as a previous suit . . . will be precluded.") (quotation marks omitted)*; see also Wilkes v. Wyo. Dep't of Emp't Div. of Labor Standards*, 314 F.3d 501, 504 (10th Cir. 2002) ("[A] cause of action includes all claims or legal theories of recovery that arise from the same transaction, event, or occurrence."). We determine if an event is the same "pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations." *Hatch*, 471 F.3d at 1149 (quotation marks omitted). We turn to the DHOL Plaintiffs' arguments now.

      *a. The events relevant to this litigation post-date* Lyall

      The DHOL Plaintiffs argue the causes of action must be different because "[a]ll of the events litigated in this lawsuit not only post-date the filing of the *Lyall* case, but also

---

the parties." *Id*. at 1150–51 (10th Cir. 2006). The DHOL Plaintiffs argue the *Lyall* settlement agreement "did not explicitly settle, or provide that it was releasing claims related to, *future* actions by Denver and its agents [or] class-wide damages." Resp. to Mot. to Dismiss at 3, *Denver Homeless Out Loud v. Denver, Colo.*, 514 F. Supp. 3d 1278 (D. Colo. 2021) (No. 1:20-cv-02985), ECF No. 196. The terms of the *Lyall* settlement agreement, however, state otherwise. The agreement includes a broad "release of any and all unknown losses, *claims*, injuries, costs, expenses, and damages . . . *which may occur in the future.*" App. Vol. II at 295. Moreover, Exhibit A to the *Lyall* settlement agreement thoroughly details the requirements Denver must satisfy to conduct homeless sweeps in the future. *Id*. at 306–12. These requirements describe the exact length of advanced notice and the justifications Denver must provide prior to future sweeps. *Id*.

the entry of the settlement agreement in *Lyall*," meaning "[i]t would have simply been impossible for Plaintiffs to litigate their claims in this case as part of the *Lyall* case." Resp. to Mot. to Dismiss at 4, *Denver Homeless Out Loud*, 514 F. Supp. 3d 1278 (D. Colo. 2021) (No. 1:20-cv-02985), ECF No. 196. This is mistaken.

The subject of this litigation is the same as that in *Lyall*. The complaints in both cases argue Denver's multi-year custom and practice of sweeping homeless encampments without proper notice or opportunity to recover seized property violates the class's procedural due process rights. *Compare Lyall* Amended Complaint at 19, *Lyall*, 319 F.R.D. 558 (No. 1:16-cv-2155), ECF No. 54 ("Defendant's taking and destruction of property was foreseeable as Defendants had performed it on numerous prior occasions. The sweeps had become a custom of the City of Denver.") *and id.* at 33 ("Defendants' above-described policies, practices and conduct violate Plaintiffs' right to due process of law under the Fourteenth Amendment.") *with* App. Vol. III at 488 (stating that this same "custom and practice came to a head during two sweeps this summer"). Thus, the event material to our preclusion analysis is Denver's ongoing implementation of this custom—not the discrete activities occurring at each sweep. This is consistent with our pragmatic approach to res judicata, which treats circumstances that "are related in time, space, origin, or motivation" as singular claims. *Hatch*, 471 F.3d at 1149.

The DHOL Plaintiffs urged the district court to view the timing of the post-*Lyall* sweeps as constituting a new event. They stressed that claim preclusion "generally 'does not bar claims that are predicated on events that postdate the filing of the initial

complaint.'" *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc*., 140 S. Ct. 1589, 1596 (2020) (quoting *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2305 (2016)). But the reason behind this general proposition is absent here. In *Lucky Brand*, Lucky Brand used a phrase on their jeans that resembled a phrase trademarked by Marcel Fashions Group. *Id.* at 1593. The two companies litigated the dispute, and the jury found for Marcel. *Id.* Years later, Marcel sued Lucky Brand for using a similar—but different—phrase on newer pairs of jeans. *Id.* The Supreme Court held the prior suit did not preclude the latter because "the two suits [] were grounded on different conduct, involving different marks, occurring at different times." *Id.* at 1595.

Unlike in *Lucky Brand*, the "[e]vents that occur[ed] after the plaintiff file[d] [this] suit" do not "give rise to new material operative facts" that "create a new claim to relief." *Id.* at 1596. (internal quotation marks and alteration omitted). Here, the Denver Defendants continued to enforce the same custom of sweeping homeless encampments. And the alleged procedural due process violations arising from the sweeps are the same. The post-*Lyall* sweeps did not create new materially operative facts. The operative event remains Denver's practice of conducting homeless sweeps in an allegedly constitutionally deficient manner, which began before the *Lyall* litigation.

b.  *The homeless sweeps have materially changed since* Lyall

The DHOL Plaintiffs provide two reasons why "[t]he sweeps at issue in *Lyall* were different in kind, not just degree from those at issue here." Resp. to Mot. to Dismiss at 4, *Denver Homeless Out Loud*, 514 F. Supp. 3d 1278 (D. Colo. 2021) (No. 1:20-cv-

02985), ECF No. 196. First, they argue the rationale behind Denver's lack of notice changed. *Id.* ("Denver Defendants' decisions to provide no notice for the sweeps because of the First Amendment activity of Plaintiff Denver Homeless Out Loud were not at issue in *Lyall*."); *see also* Or. Arg. at 15:25–20:00 (stating the *Lyall* plaintiffs made "no claims based on sweeps conducted with no notice whatsoever based on public health and safety justifications"). Second, they argue the "COVID-19 pandemic did not underlie all of the facts and circumstances in *Lyall*." Resp. to Mot. to Dismiss at 4, *Denver Homeless Out Loud*, 514 F. Supp. 3d 1278 (D. Colo. 2021) (No. 1:20-cv-02985), ECF No. 196.

However, "'simply alleg[ing] new facts in support of claims asserted in a prior action will usually not avoid application of the claim preclusion doctrine'" unless "'such new facts *in themselves* establish *independent grounds* for a claim against the defendants in the previous action.'" *Hatch*, 471 F.3d at 1150 n.8 (quoting 18 Moore's Federal Practice § 131.22[1] (3d ed. 2006)). Neither Denver's new reasons for foregoing notice nor its decision to do so amidst a global pandemic can sustain an independent procedural due process claim.

This court asks two questions when considering a procedural-due-process claim: "(1) Did the plaintiff possess a protected property or liberty interest to which due process protections apply? And if so, (2) was the plaintiff afforded an appropriate level of process?" *Al-Turki v. Tomsic*, 926 F.3d 610, 614 (10th Cir. 2019) (quotation marks omitted). The new circumstances highlighted by the DHOL Plaintiffs do not bear on either of these questions. The DHOL Plaintiffs' "property interest in their possessions" is

identical to the property interests of the *Lyall* plaintiffs. App. Vol. III at 577. And both plaintiff classes allege their respective defendants afforded them no advanced notice or adequate opportunity to retrieve their property. Indeed, the two complaints describe the activities occurring at sweeps nearly identically, and the latter complaint does not suggest Denver's behavior meaningfully changed post-*Lyall*. *See* App. Vol. III at 524 ("Even before COVID-19, Denver Defendants customarily swept homeless individuals without notice, seized their property, and discarded it in violation of the Constitution and the *Lyall v. Denver* settlement agreement.").

Although we do consider the motivation of an actor when deciding whether two claims are the same, *see Hatch*, 471 F.3d at 1149, there is no change in motivation here that can sustain a new procedural due process claim. The DHOL Plaintiffs do not allege the motivation for conducting sweeps has changed post-*Lyall*. *Compare Lyall* Amended Complaint at 18, *Lyall*, 319 F.R.D. 558 (No. 1:16-cv-2155), ECF No. 54 (alleging the purpose underlying sweeps is to "clear the city of 'undesirables'" in the *Lyall* Amended Complaint) *with* App. Vol. III at 488 n.1 (alleging "the point [of the sweeps] is to push homeless individuals out of the public eye" in the DHOL Amended Complaint). Instead, they claim the reasons for curtailing notice have evolved such that the claim here is distinct from the procedural due process claim in *Lyall.* The *Lyall* plaintiffs did not articulate a reason why Denver provided no advance notice, but they suggested a lack of notice helped Denver achieve its goal of displacing homeless persons to boost economic development. *See Lyall* Amended Complaint at 23, *Lyall*, 319 F.R.D. 558 (No. 1:16-cv-

2155), ECF No. 54. The DHOL Plaintiffs now offer a more specific reason for the lack of notice—to abate "the threat of protesters showing up." Aple. Br. at 5. Importantly, the DHOL Plaintiffs maintain criminalizing homelessness to boost economic growth is still the primary motivation underlying the sweeps. *See, e.g.*, App. Vol. III at 490 (criticizing the "intricate and byzantine system of laws in Denver, enacted by Denver politicians at the urging of" economic development stakeholders to "criminalize homeless individuals because they lack housing and access to amenities that housing provides").

   c.  The Lyall *settlement agreement did not cover DDPHE area restrictions*

   The DHOL Plaintiffs also argue the *Lyall* settlement agreement "only talked about large scale encumbrance removals" and not DDPHE area restrictions. Or. Arg. at 15:25–20:00. We disagree. The agreement releases and forever discharges the Released Parties from "any and all . . . claims" that "*might be in any way related to . . .* any and all claims arising out of the City's alleged custom or practice . . . of sending ten or more employees or agents to clear away an encampment of multiple homeless persons by immediately seizing and discarding the property found there." App. Vol. II at 294 (emphasis added). Area restrictions are related to Denver's custom of sending ten or more agents to clear an encampment because they often precede such sweeps. *See* App. Vol. X at 2161 (Charlotte Pitt, of DOTI, testifying that the *Lyall* settlement agreement "applies both to encumbrance removal and when DOTI is [acting] in support of DDPHE area restriction[s]"). The *Lyall* settlement agreement therefore covers all the actions taken by the Denver Defendants to remediate homeless encampments.

*d.  The instant litigation raises an Eighth Amendment claim*

Finally, at oral argument, the DHOL Plaintiffs attempted to distinguish this case by noting that here, they had alleged an Eighth Amendment violation not brought in *Lyall*. Or. Arg. at 15:25–20:00. Of note, the original complaint in *Lyall* included an Eighth Amendment claim, but the plaintiffs removed this claim in their Amended Complaint. *See Lyall* Amended Complaint at 9, *Lyall*, 319 F.R.D. 558 (No. 1:16-cv-2155), ECF No. 54. Nevertheless, the inclusion of a new legal theory arising from the same facts does not rebut the Denver Defendants' preclusion defense. *See Plotner v. AT & T Corp.*, 224 F.3d 1161, 1170 (10th Cir. 2000) ("[P]arties cannot defeat [the] application [of res judicata] by simply alleging new legal theories.").

\*\*\*

We conclude the *Lyall* settlement agreement expressly releases all of the Denver Defendants from the instant procedural due process claim, which arises from the same municipal custom of sweeping homeless encampments at issue in *Lyall*. As a result, the DHOL Plaintiffs' procedural due process claim is claim-precluded.

## C.  *Grant of Preliminary Injunction*

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). An injunction can issue only if each factor is established. *Id.* at 23–24 (declining to review

the likelihood of success factor after concluding the disputed injunction was not in the

public interest); *see also Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 888 (10th Cir.

2013) (unpublished) ("A party seeking a preliminary injunction must prove that *all four*

of the equitable factors weigh in its favor."). Of note, the final two factors "merge when

the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"Issuing a preliminary injunction based only on a possibility of irreparable harm is

inconsistent with our characterization of injunctive relief as an extraordinary remedy that

may only be awarded upon a clear showing that the plaintiff is entitled to such relief."

*Winter,* 555 U.S. at 22 (citation omitted).

In the absence of argument from the Denver Defendants, the district court did not

evaluate the preclusion defense when analyzing whether the DHOL Plaintiffs' procedural

due process claim was likely to succeed on the merits. Instead, it proceeded straight to the

balancing test typically used to determine whether the government afforded a plaintiff

due process. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (instructing courts to

determine what process is due by balancing the private interest affected, the risk of an

erroneous deprivation in light of the probable value of additional safeguards, and the

government's interest). The district court found the *Mathews* factors weighed heavily in

the DHOL Plaintiffs' favor given that (1) the sweeps "depriv[ed] Plaintiffs of most, if not

all," of their property; (2) the morning-of notice "carries a significant risk that homeless

individuals have been and will be erroneously deprived of property;" and (3) the Denver

Defendants' decision to forego advance notice was "not based on actual, scientific, or evidence-based, public health concerns." App. Vol. VII at 1501, 1496, 1499.

The district court therefore held that the DHOL Plaintiffs "have established a substantial likelihood of success on the merits of their Fourteenth Amendment procedural due process claim." *Id.* at 1503. It further held that the seizure and potential destruction of the DHOL Plaintiffs' "vital possessions . . . necessary to survive outside in the elements . . . constitutes irreparable harm," and that the public interest weighed in favor of granting an injunction because "the Denver Defendants have not come close to demonstrating that a requirement of at least seven days' notice before an encampment sweep will preclude it from fulfilling its duty to protect public health and safety." *Id.* at 1523–24.

We review the district court's grant of a preliminary injunction for abuse of discretion. *State v. U.S. Envtl. Prot. Agency*, 989 F.3d 874, 883 (10th Cir. 2021). "An abuse of discretion occurs where a decision is premised on an erroneous conclusion of law or where there is no rational basis in the evidence for the ruling." *Id.* (quotation marks omitted). Here, we analyze the district court's decision through the prism of the Supreme Court's direction to reach preclusion sua sponte when appropriate.[15]

---

[15] The dissent would not view this case as presenting such circumstances. We respectfully disagree. A preliminary injunction is an extraordinary remedy that "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008). Here, the complaint itself calls that likelihood into question by framing this action as one to enforce the *Lyall* settlement agreement. And the Supreme Court has directed us not to ignore such obvious preclusion concerns, even where the defendant has failed to raise them. *See Arizona v. California,*

Viewing the preliminary injunction order through this lens, we conclude the
district court committed both kinds of errors when analyzing the first preliminary
injunction factor. First, the district court legally erred by (1) not finding the DHOL
Plaintiffs' procedural due process claim was precluded, and (2) holding a precluded claim
was likely to succeed on the merits. *Cf. BP Am. Prod. Co. v. Chesapeake Expl., LLC*, 747
F.3d 1253, 1259 (10th Cir. 2014) ("The application of claim preclusion is a question of
law we review de novo."). A precluded claim is, by definition, incapable of succeeding
on the merits because the court is barred from resolving it. *See Wilkes*, 314 F.3d at 504.
Second, the district court failed to consider record evidence of potentially dispositive
terms in the *Lyall* settlement agreement. Its conclusion therefore lacked a rational basis in
the evidence. *See Clyma v. Sunoco, Inc.*, 594 F.3d 777, 783 (10th Cir. 2010) (stating it is
an abuse of discretion to "fail[] to consider the . . . facts upon which the exercise of its
discretionary judgment is based") (quotation marks omitted).

Accordingly, the district court abused its discretion in ruling the first preliminary
injunction factor weighed in the DHOL Plaintiffs' favor. Because a movant must show all

---

530 U.S. 392, 412 (2000). Further, our decision is not final because it merely holds that
the DHOL Plaintiffs have failed to show the likelihood of success on the merits based on
the record before us. Nothing prevents the parties from raising further arguments or
presenting additional facts to the district court upon remand. Finally, if the district court
concludes the claims upon which the injunction was issued are indeed precluded, the
DHOL Plaintiffs can pursue them in the proper state forum—something that should
happen without unnecessary delay.

four factors before a preliminary injunction can issue, the district court also abused its discretion by granting the preliminary injunction.

### III.  CONCLUSION

For these reasons, we VACATE the district court's order and REMAND for further proceedings consistent with this decision.

*Denver Homeless Out Loud, et al v. Denver, Colorado, et al*, No. 21-1025

**ROSSMAN**, J., dissenting

Appellate courts are courts of "review, not of first view." *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005). In this interlocutory appeal, our task is narrow: to review the district court's order granting in part and denying in part the DHOL Plaintiffs' motion for preliminary injunction. My colleagues take the extraordinary step of raising the affirmative defense of claim preclusion sua sponte on behalf of the Denver Defendants to reverse the district court. I see no basis for this unwarranted exercise of appellate discretion.

The Denver Defendants did not raise claim preclusion in the preliminary injunction litigation. The majority overlooks this failure of preservation and instead faults the district court for entering the preliminary injunction "without considering if the *Lyall* settlement agreement barred the [procedural due process] claim." (Maj. Op. at 13). Recall, this is the very constitutional claim that, after a three-day evidentiary hearing, the district court determined was likely to succeed on the merits. And that likelihood-of-success determination was made by the same judge who approved the *Lyall* settlement agreement—and therefore presumably knew something about its scope.

As the majority acknowledges, the Denver Defendants raised preclusion in a motion to dismiss two months after they appealed from the district court's preliminary injunction order. *See* Mot. to Dismiss, *Denver Homeless Out Loud v. Denver, Colo.*, 514 F. Supp. 3d 1278 (D. Colo. 2021) (No. 1:20-cv-02985), ECF No.

176. In that motion, the Denver Defendants for the first time asserted, among other contentions, that the *Lyall* settlement agreement had a preclusive effect on this lawsuit.[1] The district court has yet to rule on that pending motion, which is not part of the appellate record.

The Denver Defendants also did not raise claim preclusion in this interlocutory appeal. Content to proceed without supplemental briefing, the majority relies only on arguments in the pending motion to dismiss filings to reverse the district court's preliminary injunction ruling, concluding "the *Lyall* settlement agreement includes a broad release that unequivocally prevents the DHOL Plaintiffs from asserting this specific procedural due process claim against the Denver Defendants." (Maj. Op. at 14). The majority sees no doubt as to the proper resolution of the preclusion issue or the wisdom of deciding it without the full rigors of the adversarial process.

Res judicata is an instrument with blunt force. Here, the majority's decision to raise it sua sponte puts an end to the preliminary injunction and all but directs a decision on the Denver Defendants' pending motion to dismiss. I have serious concerns, not shared by the majority, about whether the circumstances justify exercising our appellate discretion to raise claim preclusion sua sponte. And I disagree with my colleagues that the *Lyall* settlement agreement unequivocally

---

[1] An earlier motion to dismiss was filed on November 11, 2020, but struck a few weeks later for failure to comply with the district court's practice standards. *See Denver Homeless Out Loud*, 514 F. Supp. 3d 1278 (D. Colo. 2021) (No. 1:20-cv-02985), ECF No. 82; *Denver Homeless Out Loud*, 514 F. Supp. 3d 1278 (D. Colo. 2021) (No. 1:20-cv-02985), ECF No. 127.

precludes the DHOL Plaintiffs' procedural due process claim. Accordingly, I respectfully dissent.

## I.     *Ordinary limitations on our appellate discretion, not discussed by the majority, counsel strongly for restraint.*

The Denver Defendants did not advance a "preclusion defense" in their appellate briefing. The majority excuses this deficiency, notwithstanding the well-settled rule that appellate courts seldom depart from the party presentation principle. "In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008); *see also United States v. Burkholder*, 816 F.3d 607, 620 n.11 (10th Cir. 2016) ("In our adversary, common-law system, courts properly answer only the questions that the parties present to them and that are necessary for the resolution of the case at hand."). Besides this failure of appellate presentation, the record confirms the preclusion defense was not presented to or passed on by the district court before it decided the DHOL Plaintiffs' request for a preliminary injunction.

Appellate courts rarely consider claims not raised first in the district court. *Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed on below."); *Shell Rocky Mountain Prod., LLC v. Ultra Res., Inc.*, 415 F.3d 1158, 1164 (10th Cir. 2005) ("As a general rule, we do not review matters raised for the first time on appeal."). "We

review the case litigated below, not the case fleshed out for the first time on appeal." *Ball v. United States*, 967 F.3d 1072, 1078 (10th Cir. 2020). To properly preserve an issue for appeal, a party must "alert[ ] the district court to the issue and seek[ ] a ruling." *U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.*, 582 F.3d 1131, 1142 (10th Cir. 2009) (quoting *Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1141 (10th Cir. 2007)). "An appellant forfeits an argument by failing to preserve it in district court." *Ave. Cap. Mgmt. II, L.P. v. Schaden*, 843 F.3d 876, 885 (10th Cir. 2016).

We have cautioned that "our discretion to hear issues for the first time on appeal" is to be exercised "only in the most unusual circumstances," such as "where the proper resolution [of the issue] is beyond any doubt" or where "injustice might otherwise result." *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 721 (10th Cir. 1993) (quoting *Singleton*, 428 U.S. at 121); *accord Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1228 (10th Cir. 2008) ("We have 'discretion to make exceptions [to this rule] in extraordinary circumstances,' but will do so only when 'the issues involved are questions of law, the proper resolution of which are beyond reasonable doubt, and the failure to address the issues would result in a miscarriage of justice.'") (citations omitted). The majority does not state this general rule or explain why it should be relaxed here. As I will discuss, the proper resolution of the claim preclusion issue is not beyond any doubt, and injustice is not avoided but may be instrumented by the majority's unprecedented choice to raise res judicata sua sponte to reverse the district court.

4

The majority assumes, without discussion, that the Denver Defendants could have raised preclusion for the first time on appeal. But preclusion is an affirmative defense that must be deployed according to specific procedural rules.[2] *See* Fed. R. Civ. P. 8(c). Failing to plead an affirmative defense below results in waiver, and the issue cannot be raised for the first time on appeal. *Wood v. Milyard*, 566 U.S. 463, 470 (2012) ("An affirmative defense, once forfeited, is 'exclu[ded] from the case . . . .'") (alteration in original) (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1278 (3d ed. 2004)); *Schramm v. Oakes*, 352 F.2d 143, 150 (10th Cir. 1965) (explaining res judicata must be raised "on the trial level and cannot be raised for the first time upon appeal"). This rule doesn't apply to jurisdictional defenses, but "[p]reclusion, of course, is not a jurisdictional matter." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp*., 544 U.S. 280, 293 (2005). Here, the Denver Defendants did not file an answer and only asserted the preclusive effect of the *Lyall* settlement agreement as an argument in a motion to dismiss filed several months after this appeal was noticed. At the time of the preliminary injunction proceedings, the Denver Defendants' preclusion defense was not even part of the case. These circumstances certainly make this interlocutory appeal extraordinary, but in a way that counsels restraint, not sua sponte action.

---

[2] Maybe the Denver Defendants are relying not on preclusion but on release, which is a distinct affirmative defense under Federal Rule of Civil Procedure 8(c)(1). It is hardly necessary to say release also must be affirmatively plead.

5

## II.    Our discretion to reverse on a sua sponte ground—particularly involving an affirmative defense—is far more limited than the majority suggests.

"[A]ppellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 147 n.10 (2011) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983). We typically will not even *affirm* on a ground not passed on below. *Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1225 n.13 (10th Cir. 2017) ("We decline to reach any potential alternative grounds to affirm not ruled on by the district court."). Yet the majority states, without hesitation, that courts may raise and decide issues sua sponte to *reverse* a lower-court judgment. Our cases confirm this power exists but caution it must be exercised "only sparingly." *Margheim v. Buljko*, 855 F.3d 1077, 1088 (10th Cir. 2017); *see also Planned Parenthood of Kan. & Mid-Mo. v. Moser*, 747 F.3d 814, 836-38 (10th Cir. 2014); *Hill v. Corizon Health, Inc.*, 712 F. App'x 811, 817 (10th Cir. 2017) (Hartz, J., concurring in part) ("We should be very circumspect about sua sponte raising an issue requiring reversal."); *cf. Stahmann Farms, Inc. v. United States*, 624 F.2d 958 (10th Cir. 1980) (exercising discretion to consider issue for first time on appeal where the issue was a ground for affirming, not reversing, the trial court).

It is particularly unusual to invoke the affirmative defense of claim preclusion sua sponte *to reverse*. Affirmative defenses are not the usual subject of an appellate court's sua sponte discretion. *See Maalouf v. Islamic Republic of Iran*, 923 F.3d

6

1095, 1109 (D.C. Cir. 2019) (emphasis added) ("It is well established that a statute of limitations, *like other affirmative defenses*, generally may not be invoked by the court on its own motion.") (citing *United States v. Mitchell*, 518 F.3d 740, 748 (10th Cir. 2008) ("[A]ll circuits to consider this issue have held so explicitly.")). "The presumption," of course, "is to hold the parties responsible for raising their own defenses." *Mitchell*, 518 F.3d at 749. As the Fifth Circuit has observed, "an appellate court can address res judicata for the first time on appeal, *but only to affirm* the district court's judgment and only if all of the relevant facts are contained in the record and are uncontroverted." *Energy Dev. Corp. v. St. Martin*, 296 F.3d 356, 361 (5th Cir. 2002) (emphasis added). The majority cites no case where we have invoked res judicata sua sponte to reverse the decision below, and my own research has uncovered no such authority.

When we have reversed the district court on a sua sponte ground, the parties are first allowed to address the dispositive issue we have identified. That opportunity is starkly missing here. *See Planned Parenthood of Kan. & Mid-Mo.*, 747 F.3d at 838 (exercising discretion to reverse on sua sponte grounds where the party affected had two opportunities to brief the subject on appeal); *Margheim*, 855 F.3d at 1089 (exercising discretion to reverse on sua sponte grounds where the parties had an opportunity to address the issue in their appellate briefs); *see also Headwaters v. U.S. Forest Serv.*, 399 F.3d 1047, 1055 (9th Cir. 2005) (stating the Ninth Circuit has never "upheld a dismissal for claim or issue preclusion where the parties were not given any opportunity to be heard on the issue").

The majority contends the parties "thoroughly debated the preclusive effect of the *Lyall* settlement agreement in the district court" and "fully briefed the [preclusion] issue." (Maj. Op. at 18). But claim preclusion was not asserted in a responsive pleading, raised in the preliminary injunction proceedings, considered by the district court, or argued by the parties on appeal. If the majority means the few pages of argument in motion to dismiss papers filed after the preliminary injunction entered, that hardly seems to me like thorough debate and full briefing. Filings in the district court that remain pending for decision, even if we may take judicial notice of them, are not an appropriate proxy for a full and fair *appellate* opportunity to be heard. Appellate litigants should not be surprised by a final decision because they had no chance to present meaningful argument on the issue that this court, on its own, has decided is dispositive.

### III.    *The special circumstance contemplated in* **Arizona v. California** *is not present here.*

The majority relies on *Arizona v. California*, 530 U.S. 392, 412 (2000), for the proposition that "the Supreme Court *has encouraged* courts to raise preclusion sua sponte when 'special circumstances' exist." (Maj. Op. at 17) (emphasis added). In *Arizona*, the Supreme Court held the "[j]udicial initiative" of addressing preclusion sua sponte "*might be appropriate* in special circumstances." *Arizona*, 530 U.S. at 412 (emphasis added). I do not read "might be appropriate" to mean "encouraged." The majority likewise states the Supreme Court has suggested "courts should consider 'an issue antecedent to and ultimately dispositive of the dispute before it, even an issue

the parties fail to identify and brief' on appeal," quoting *United States National Bank of Oregon v. Independent Insurance Agents of America, Inc.*, 508 U.S. 439, 447 (1993). (Maj. Op. at 18). But in *United States National Bank*, the Supreme Court only acknowledged that a court "*may* consider" such an issue on its own initiative in the appropriate case. 508 U.S. at 447 (emphasis added); *see also id.* (holding the court of appeals "had discretion to consider the validity of [the statutory provision], and under the circumstances did not abuse it").[3] The majority's reasoning seems to blur the line separating authority and obligation, but there is a wide delta between acknowledging the existence of sua sponte discretion and directing its exercise. A broad understanding of our prudential discretion would stray from well-settled limitations on appellate review. *See Clodfelter v. Republic of Sudan*, 720 F.3d 199, 212 (4th Cir. 2013) (Davis, J., concurring) ("*[S]ua sponte* invocation of the res judicata affirmative defense is and should be the rare exception, not the rule, and one reserved for truly 'special circumstances.'").

*Arizona* described only one special circumstance where it might be appropriate for a trial court to raise preclusion sua sponte:

> if a court is on notice that it has previously decided the issue presented, the court may dismiss the action *sua sponte*, even though the defense has not been raised. This result is fully consistent with the policies underlying res judicata: it is not based solely on the defendant's interest in avoiding the

---

[3] And even in *United States National Bank*, unlike here, the court of appeals had directed the parties to be prepared to address the issue at oral argument, ordered supplemental briefing, and did not resolve the appeal until "[a]fter giving the parties ample opportunity to address the issue." 508 U.S. at 448.

burdens of twice defending a suit, but is also based on the avoidance of unnecessary judicial waste.

*Arizona*, 530 U.S. at 412 (quoting *United States v. Sioux Nation*, 448 U.S. 371, 432 (1980) (Rehnquist, J., dissenting)). That special circumstance was absent in *Arizona* and is also absent here.[4]

The majority maintains this case presents special circumstances because "we have ample notice that the district court *may have previously resolved* the instant procedural due process claim." (Maj. Op. at 18) (emphasis added). But *Arizona* requires that the trial court "*has previously decided*" the issue. *Arizona*, 530 U.S. at 412 (emphasis added). The district court here never previously decided the instant procedural due process claim. The question presented is whether the claim was released in the *Lyall*

---

[4] Query whether the narrow exception in *Arizona* applies to the sua sponte invocation of the res judicata affirmative defense by the court of appeals. The Supreme Court did not have appellate courts front of mind in *Arizona*, which focused solely on the ability of a *trial court* to control its own resources by refusing to permit relitigation of claims that were previously adjudicated by *that very court*. In *Arizona* itself, the preclusion argument was based on prior decisions of the Supreme Court sitting in original jurisdiction over the longstanding water-rights dispute at issue there. Nevertheless, the Court refused to apply res judicata once it had been waived because "this Court plainly ha[d] not 'previously decided the issue presented.'" *Arizona*, 530 U.S. at 412. Our sister circuits have primarily cited *Arizona* when reviewing a district court's decision to invoke res judicata sua sponte. *See Clodfelter v. Republic of Sudan*, 720 F.3d 199, 208-10 (4th Cir. 2013) (reviewing sua sponte invocation of res judicata by the district court); *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1054-56 (9th Cir. 2005) (same); *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1104-05, 1112 (D.C. Cir. 2019) (same). *But cf. Akanthos Cap. Mgmt., LLC v. Atlanticus Holdings Corp.*, 734 F.3d 1269, 1272 (11th Cir. 2013) (acknowledging appellate discretion to raise affirmative defense of res judicata sua sponte to affirm the decision below).

10

settlement agreement, and in my view, that question should not be resolved on appeal by raising preclusion sua sponte.

The majority emphasizes that invoking preclusion sua sponte furthers the court's interest in "the avoidance of unnecessary judicial waste." (Maj. Op. at 18) (quoting *Arizona*, 530 U.S. at 412). Judicial efficiency is a vital interest but it should further—not bypass—the adversarial process. As the Supreme Court explained, "[w]here no judicial resources have been spent on the resolution of a question, trial courts must be cautious about raising a preclusion bar *sua sponte*, thereby eroding the principle of party presentation so basic to our system of adjudication." *Arizona*, 530 U.S. at 412-13. Here, the district court is poised to determine the preclusive effect of the *Lyall* settlement agreement by ruling on the Denver Defendants' pending motion to dismiss. Time and costs associated with preparing and responding to that motion have already been incurred, thus reducing the potential efficiencies that a res judicata disposition on appeal would achieve.

We have previously relied on *Arizona* in the context of Federal Rule of Appellate Procedure 4(b)'s time bar, observing "when a rule implicates judicial interests beyond those of the parties, it may be appropriate for a court to invoke the rule *sua sponte* in order to protect those interests." *Mitchell*, 518 F.3d at 750 (citing *Arizona*, 530 U.S. at 412). With respect, I fail to see what "judicial waste" would occur, or what important institutional interests would be compromised, had we ordered a limited remand of the preclusion question, or abated this interlocutory appeal until the district court adjudicated the Denver Defendants' pending motion to

11

dismiss—or at minimum, allowed the parties an opportunity to file supplemental appellate briefs.

Finally, I am concerned the majority has too readily sacrificed the district court's role, which, like the principle of party presentation, is "basic to our system of adjudication." *Arizona*, 530 U.S. at 413. It is the special competence of trial courts that informs "the institutional limits on what an appellate court can do." *Caldwell v. Mississippi*, 472 U.S. 320, 330 (1985). Here, Judge Martinez presided over the *Lyall* class action; he approved the *Lyall* settlement agreement; he is presiding over the instant class action; he determined that DHOL Plaintiffs' procedural due process claim was likely to succeed on the merits; and he has been asked to decide the preclusive effect of the *Lyall* settlement agreement in the Denver Defendants' motion to dismiss. "Due regard for the trial court's processes and time investment is also a consideration appellate courts should not overlook." *Wood*, 566 U.S. at 473. Under the circumstances, it is a mistake to forge ahead without deference to this *particular* district court's inimitable institutional advantage.

### IV.     *The preclusive effect of the* **Lyall** *settlement agreement is not beyond reasonable doubt.*

We have sometimes relaxed the rule against determining an issue for the first time on appeal "if it is a pure matter of law and its proper resolution is certain." *Cox v. Glanz*, 800 F.3d 1231, 1246 n.7 (10th Cir. 2015) (quoting *United States v. Lyons*, 510 F.3d 1225, 1238 (10th Cir. 2007)); *see also Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 721 (10th Cir. 1993). This narrow exception aligns with an appellate

court's institutional role. *See, e.g.*, *Sabol v. Snyder*, 524 F.2d 1009, 1011 (10th Cir. 1975) ("It is obviously not the function of the appellate court to try the facts or substitute for the trial court in the determination of factual issues."). The issue here is whether the final judgment of dismissal in the *Lyall* class action precludes the procedural due process claim asserted by the DHOL Plaintiffs in the instant class action. The majority insists this preclusion question is appropriate for sua sponte resolution because it is purely a matter of law and its disposition is certain. I am not so sure.

    *First, I respectfully submit the majority uses the wrong doctrinal framework.* As a general matter, "[w]hether the doctrine of res judicata applies to the case before us is a question of law . . . ." *Wilkes v. Wyoming Dep't of Emp. Div. of Lab. Standards*, 314 F.3d 501, 503 (10th Cir. 2002).[5] The circumstances here do not permit such quick work. Our inquiry must proceed according to the procedural nuances surrounding the preclusive effect of class action settlements. The *Lyall* class action was dismissed "as settled," following the district court's approval of the *Lyall* settlement agreement. This is commonly known as a "settlement judgment." *See Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 375 (1996).[6]

---

[5] Typically, this "court employs the terms 'claim preclusion' instead of 'res judicata.'" *Id.* at 504 n.1.

[6] The majority assumes the terms of the *Lyall* settlement agreement were incorporated into the final judgment of dismissal. The preliminary injunction order says otherwise: "As previously noted, this Court in *Lyall* did not retain jurisdiction over the litigation post-judgment, nor did it incorporate the terms of the *Lyall* Settlement into the Final Judgment that dismissed the case." Aplt. App. vol. VII at

13

"The scope of a judgment in a litigated class action parallels the scope of any litigated judgment: it will preclude claims arising out of the same transaction and occurrence." 6 William B. Rubenstein, *Newberg on Class Actions* § 18:19 (5th ed. 2019). But courts evaluate the preclusive effect of a settlement judgment, not according to traditional res judicata doctrine, but under the "identical factual predicate test." *See id.* Because settlement judgments often contain broad release language, courts have generated a class-action-specific doctrine giving preclusive effect to releases contained in settlements so long as the released conduct arises out of the "identical factual predicate" as the claims at issue in the case. *Id.* "Courts have declined to approve (and enforce) releases that go beyond the alleged misconduct in the underlying action on the ground that barring claims arising from a different factual predicate than that alleged in the complaint would violate due process." 2 *McLaughlin on Class Actions* § 6:29 (18th ed. 2021). Circuits that have considered

---

1504-1505 (citing ECF No. 14-2); *see Lyall v. City of Denver*, Case No. 16-cv-2155-WJM-SKC, ECF No. 226 (D. Colo. Sept. 23, 2019)). This is a significant factual distinction and undermines reliance on *Hatch v. Boulder Town Council*, 471 F.3d 1142, 1150 (10th Cir. 2006). The majority notes that "[e]ven if the causes of action in *Lyall* and this case are distinct, there are 'several exceptions [in *Hatch*] to the rule that only claims related to the existing transaction are precluded' under the doctrine of res judicata." (Maj. Op. at 25 n.12). But, as *Hatch* makes clear, the exception the majority invokes is applicable only "where the judgment entered in the prior action . . . incorporated a settlement intended to govern future, related transactions between the parties." *Hatch*, 471 F.3d at 1150-51; *see also* Maj. Op. at 25. Those circumstances are not present here.

the identical factual predicate test have adopted it as the appropriate framework for analyzing the preclusive effect of a settlement judgment.[7]

The majority does not mention the identical factual predicate test, even though our court has acknowledged its existence and district courts in our circuit have applied it.[8] Indeed, in a recent unpublished decision, we observed that, under the identical factual predicate test, "class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct." *Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC*, 807 F. App'x 752, 765 (10th Cir. 2020) (quoting *Wal-Mart Stores, Inc.*, 396 F.3d at 107); *see also Chieftain Royalty Co. v. BP Am. Prod. Co.*, No. 18-CV-00054-GKF-JFJ, 2020 WL 1476419, at *9 (N.D. Okla.

---

[7] *See, e.g.*, *Reppert v. Marvin Lumber & Cedar Co.*, 359 F.3d 53, 58-59 (1st Cir. 2004); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 248 (2d Cir. 2011); *Berry v. Schulman*, 807 F.3d 600, 616 (4th Cir. 2015); *Williams v. Gen. Elec. Cap. Auto Lease, Inc.*, 159 F.3d 266, 274 (7th Cir. 1998); *TVPX ARS, Inc. v. Genworth Life & Annuity Ins. Co.*, 959 F.3d 1318, 1326 (11th Cir. 2020).

[8] *See generally* Kris J. Kostolansky & Diane R. Hazel, *Class Action Settlements: Res Judicata, Release, and the Identical Factual Predicate Doctrine*, 55 Idaho L. Rev. 263, 275 (2019) (collecting cases); *see also Weller v. HSBC Fin. Corp.*, 187 F. Supp. 3d 1263, 1266 (D. Colo. 2016) ("[P]arties to a class action may release, on behalf of the class, both 'claims not presented and even those which could not have been presented as long as the released conduct arises out of the identical factual predicate as the settled conduct." ) (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 107 (2d Cir. 2005)); *In re Oppenheimer Champion Fund Sec. Fraud Class Actions*, No. 09-CV-00386-JLK-KMT, 2013 WL 12241614, at *2 (D. Colo. Oct. 8, 2013) (quoting *Matsushita*, 516 U.S. at 376-77 (1996)) ("[A] court may permit the release of a claim based on the 'identical factual predicate' as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action.").

Mar. 26, 2020) (citing *Sefcovic* and observing that "[i]n a recent unpublished decision, a Tenth Circuit panel recognized. . .the identical factual predicate rule"). The identical factual predicate inquiry is "fact-based," *Newberg on Class Actions* § 18:19, and proceeds by reference to the terms of the release itself. *See, e.g., Norfolk S. Corp. v. Chevron, U.S.A., Inc.*, 371 F.3d 1285, 1289 (11th Cir. 2004) (observing distinction between res judicata effect of previously litigated case and res judicata effect of settlement agreement).

The majority references traditional res judicata analysis to assess the preclusive effect of the *Lyall* settlement judgment. But res judicata principles leave the DHOL Plaintiffs' lawsuit unscathed. The doctrine of res judicata "prohibits 'successive litigation of the very same claim' by the same parties." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2305 (2016) (quoting *New Hampshire v. Maine,* 532 U.S. 742, 748 (2001)). This prohibition bars "the parties or their privies from relitigating issues that were or could have been raised" in an action that resulted in a final judgment on the merits. *Allen v. McCurry*, 449 U.S. 90, 94 (1980). There is no dispute the events litigated in this lawsuit postdate the filing of the *Lyall* class action in 2016 and the approval of the *Lyall* settlement agreement in 2019. Because the procedural due process claim in this class action is "predicated on events that postdate" the prior class action, it is, by definition, not "the very same" as any claim in *Lyall*. *Whole Woman's Health*, 136 S. Ct. at 2305 (quoting in part *Morgan v. Covington Twp.*, 648 F.3d 172, 178 (3d Cir. 2011)); *see Clark v. Young & Co.*, 5 U.S. (1 Cranch) 181, 181 (1803) (explaining that where a lawsuit is "upon distinct and

16

different causes of action" from those at issue in a prior lawsuit against the same
defendant, "the first cannot be pleaded in bar of the second").

The majority maintains the subject of this action is "the same as that in *Lyall*"
because the DHOL Plaintiffs' complaint concerns Denver's "ongoing
implementation" of its custom and practice of sweeping homeless encampments.
(Maj. Op. at 27). But as the Supreme Court has explained, even if a later lawsuit
alleges ongoing unlawful conduct, res judicata does not bar claims "which could not
possibly have been sued upon in the previous case." *Lawlor v. Nat'l Screen Serv.
Corp.*, 349 U.S. 322, 328 (1955) (recognizing that a course of conduct may
frequently give rise to more than a single cause of action).

*Second, the release in the Lyall settlement agreement might reasonably be
construed more narrowly than the majority suggests.* The *Lyall* settlement agreement
includes a Colorado choice-of-law provision. *See* Aplt. App. vol. II at 295. When
questions about a release's scope arise, Colorado courts answer them with "general
contractual rules of interpretation and construction." *McCracken v. Progressive
Direct Ins. Co.*, 896 F.3d 1166, 1172 (10th Cir. 2018) (quoting *Bunnett v. Smallwood*,
793 P.2d 157, 159 (Colo. 1990)). "Accordingly, they interpret releases 'so as to
effectuate the manifest intention of the parties.'" *Id.* (quoting *Neves v. Potter*, 769
P.2d 1047, 1053 (Colo. 1989)). Whether a contract is ambiguous is a question of law
for the court, but if there is ambiguity, the meaning of the contract—or the scope of
the release—is one of fact. *See, e.g.*, *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1544 (10th
Cir. 1993) ("Because the Release is ambiguous, the determination of what the parties

17

intended to be included within its scope is a fact question for the jury."); *Colorado Interstate Gas Co. v. Chemco, Inc.*, 833 P.2d 786, 789 (Colo. App. 1991) ("Once the contract is determined to be ambiguous, it must be construed in accordance with the intent of the parties, and relevant evidence may be considered to resolve factual questions of the parties' intent.").

The *Lyall* settlement agreement releases "any and all claims arising out of [Denver's] alleged custom or practice (written or unwritten) of sending ten or more employees or agents to clear away an encampment of multiple homeless persons by immediately seizing and discarding the property found there." Aplt. App. vol. II at 294. The release in *Lyall* is undeniably broad, but "a settlement agreement's bare assertion that a party will not be liable for a broad swath of potential claims does not necessarily make it so." *Hesse v. Sprint Corp*., 598 F.3d 581, 590 (9th Cir. 2010). According to the majority, the instant procedural due process claim is barred because it "arises from the same municipal custom of sweeping homeless encampments at issue in *Lyall*." (Maj. Op. at 32). I respectfully disagree that the *Lyall* settlement agreement unambiguously defines the scope of the release and the intent of the settling parties.

Here are just a few examples to illustrate my concern. What does "custom" mean? The majority contends the "event material to our preclusion analysis" is generally "Denver's multi-year custom and practice of sweeping homeless encampments without proper notice or opportunity to recover seized property . . . ." (Maj. Op. at 27). But the "custom" described in the release is actually specific,

requiring (1) "ten or more employees or agents," (2) "an encampment of multiple homeless persons," and (3) the "immediate[] seizing and discarding [of] property found there." Aplt. App. vol. II at 294.

What does "clear away" mean? The release specifies claims are released when employees or agents clear away an encampment by "immediately seizing and discarding the property found there." *Id.* Was the Lincoln Park encampment "cleared away" when individuals were permitted to re-enter the park to retrieve their property and were not forbidden from re-entering the cleaned area again? What if the tent contained no property to immediately seize or discard? Must a sweep "clear away" an encampment by *immediately* seizing and discarding all property found there to come within the scope of the release? Does the Lincoln Park sweep fall outside the *Lyall* settlement agreement's definition because park rangers "hopscotched" over nonhazardous property, rather than simultaneously discarded it with hazardous items like hypodermic needles? Is property voluntarily stored by individuals through Denver's property storage program "discarded" for purposes of our preclusion analysis?

Further, what does "encampment" mean? The Denver Defendants concede the word "encampment" is ambiguous. Aplt. Br. at 49-50.[9] The Denver Defendants ask if five people residing outside constitutes an "encampment." *See id.* at 50. This is an

---

[9] Notably, Judge Lucero also identified "[t]he ambiguity inherent in the word 'encampment'" in his dissent from the order denying the Denver Defendants' motion to stay the injunction pending appeal. Order at 5, March 1, 2021.

important question, since one sweep of the many alleged in DHOL Plaintiffs'
complaint involved four individuals. Aplt. App. vol. VIII at 1574, ¶ 185. Other
alleged sweeps involved anywhere from 10 to 300 individuals. *Id.* at 1572-74,
¶¶ 174-185. How many of these sweeps involve "encampments"? Do all the alleged
sweeps involve "multiple" homeless persons? Aplt. App. vol. II at 294.

  The majority's justification for raising preclusion sua sponte depends on
unequivocal answers to these questions. But the *Lyall* settlement agreement is at best
ambiguous, making the claim preclusion question here unsuitable for resolution as a
pure matter of law. *Amoco Rocmount Co. v. Anschutz Corp*., 7 F.3d 909, 918 (10th
Cir. 1993) *abrogated on other ground by Hertz Corp. v. Friend*, 559 U.S. 77 (2010)
(quoting *Colorado Interstate Gas*, 833 P.2d at 789) ("Once the contract is determined
to be ambiguous, it must be construed in accordance with the intent of the parties,
and relevant evidence may be considered to resolve factual questions of the parties'
intent."). The Supreme Court has recognized the fact-bound quality of preclusion
problems, noting "[r]esolution of this [prelusion] question would require fact-intensive
analyses of whether this issue was fully and fairly litigated in [the other case] or was
forfeited in this litigation, among other matters. These gateway issues should be decided
before this Court addresses them." *Herrera v. Wyoming*, 139 S. Ct. 1686, 1701 n.5 (2019)
(declining the invitation to consider preclusion sua sponte where the district court had not
passed on the issue); *see also Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1279
n.13 (10th Cir. 2000) (noting remand is appropriate "to develop a record on the

nature and factual bases for the dismissed claim [in earlier action] and to compare those with the nature and factual basis for the claim in the instant case").

"No further factual development is necessary[,]" the majority says, because the motion to dismiss briefing describes the post-*Lyall* sweeps and the district court conducted a multi-day evidentiary hearing on those sweeps. (Maj. Op. at 19). In my view, the preliminary injunction record does not fully resolve the scope of the *Lyall* settlement agreement.[10] And the motion to dismiss briefing highlights the existence of factual disputes about the settlement's scope, particularly whether the parties intended to preclude post-settlement claims arising under different facts and alleged to be improper for different reasons. "Inevitably, courts must struggle with the uncertain consequences of ambiguous settlement agreements and judgments. The conflicting pressures are apparent, but impenetrable obscurity is likely to be resolved against preclusion." 18A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4443 (3d ed. 2022).

The majority concludes with certainty the DHOL Plaintiffs intended to give up the instant procedural due process claim in settling *Lyall*. But an ambiguous release cannot operate as a prospective waiver of civil rights liability. The Supreme Court

---

[10] To be sure, the evidentiary hearing involved the alleged violations of rights secured in the *Lyall* litigation, but that is because the DHOL Plaintiffs asserted a breach of contract claim. The Amended Complaint makes clear the DHOL Plaintiffs brought the instant lawsuit as more than an action to enforce the *Lyall* settlement agreement. They did so "to vindicate their constitutional rights, hard-earned rights under the *Lyall* settlement agreement, and inalienable human dignity." Aplt. App. Vol. III at 490, ¶ 9.

has made clear that we "do not presume acquiescence in the loss of fundamental rights" and "courts indulge every reasonable presumption against waiver." *Fuentes v. Shevin*, 407 U.S. 67, 94 n.31 (1972) (citations omitted). On this record, the majority's sua sponte determination is particularly troubling, as it could "preclude a wider range of matters than those specified in the [*Lyall* settlement agreement that] would frustrate the parties' expressed intent and bestow upon [the Denver Defendants] a windfall of immunity from litigation." *Norfolk S. Corp.*, 371 F.3d at 1291.

Finally, even if the preclusion question here is purely legal, "we decline to consider newly presented legal arguments unless the proper legal disposition *is beyond reasonable doubt*." *Schaden*, 843 F.3d at 886 (emphasis added). "The legal disposition is subject to reasonable doubt, for example, when the issue involves a matter of first impression in our circuit." *Id.* Whether the DHOL Plaintiffs' procedural due process claim is precluded requires careful study of the *Lyall* settlement agreement and the breadth of its release. Resolution of the preclusion issue here involves the application and construction of the identical factual predicate test, which our court has recognized but not expressly adopted.[11]

I am not certain the procedural due process claim alleged by the DHOL Plaintiffs shares an "identical factual predicate" with the conduct settled in *Lyall*,

---

[11] May a claim satisfy the "same conduct, transaction, or occurrence" standard under ordinary res judicata principles and fail the "identical factual predicate" test? Maybe. But that open question certainly falls within the ambit of the first-impression issue presented here and squarely resolving it, after a full adversarial process, is critical to the sound development of the law attendant to the preclusive effect of settlement judgments.

despite the outward resemblance between the two lawsuits. *See Hesse*, 598 F.3d at 591 ("The superficial similarity between the two class actions is insufficient to justify the release of the later claims by the settlement of the former."). The sweeps in this action postdate the *Lyall* settlement judgment, the Denver Defendants' use of the temporary access restrictions altered the factual scope of their allegedly unlawful conduct, and the decision to provide no notice for the sweeps here was based on the Denver Defendants' "preference to avoid" the threat of First Amendment activity rather than concern over public health—a motivation simply absent in *Lyall*. Aplt. App. vol. VII at 1499, vol. VIII at 1577, ¶ 200. But even attempting to engage with preclusion on the merits is not justified at this stage, given the open questions surrounding the doctrinal framework governing our disposition and the fact-intensive inquiry it compels.

      For these reasons, I respectfully dissent.